FILED

AUG 2 8 2018

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | No. 16-cv-00218-RCL |
| | § | |
| TOM & CAROLYN ORR, | § | |
| | § | |
| DEFENDANTS. | § | |

---

### Memorandum Opinion:
### Explaining Judgment in Favor of the Plaintiff

---

One of the defendants, Mr. Tom Orr, is liable to the United States for unpaid income taxes. ECF No. 31. He and his wife, Mrs. Carolyn Orr (the other defendant), now live on a 101.595-acre tract of land in Cost, Texas (the "Cost Property"). The Government has filed federal tax liens against Mr. Orr and all his property. The only remaining issue is this: May the government satisfy Mr. Orr's tax liability by foreclosing on and selling the Cost Property?

This question is made difficult by the defendants' assertion that the Cost Property is Mrs. Orr's sole and separate property. If that is true, then it is not clear that the Government may foreclose on and sell the property to satisfy her husband's tax liabilities. But if Mr. Orr owns any interest in the property, then the law is clear that the property may be foreclosed on and sold to satisfy his tax liabilities, with leftover funds being used to compensate Mrs. Orr for her interest in the property.

The Court held a bench trial on these issues between February 28 and March 2, 2018, in San Antonio, Texas. Having reviewed the record, the applicable law, and all the evidence admitted at that trial, and for the reasons given below, the Court concludes that the Cost Property

1

is not Mrs. Orr's sole and separate property. Rather, it is community property. Mr. Orr owns an interest in it as well. Therefore, the Government may foreclose the tax liens on and sell the property in order to satisfy Mr. Orr's tax liability.

## Analysis

### I.   Legal Frameworks

For federal tax purposes, a taxpayer's rights and interests are determined under the laws of the taxpayer's state of domicile. *See United States v. Mitchell*, 403 U.S. 190, 197 (1971) ("[F]ederal income tax liability follows ownership. In the determination of ownership, state law controls.") (internal citations omitted). The Orrs' state of domicile is Texas. Therefore, the Court must look to Texas law to see what property interests, if any, Mr. Orr has in the Cost Property and the consequences of those ownership interests.

#### A.  Texas Marital Property

In Texas, marital property consists of all property that a spouse brings into the marriage or acquires during marriage. Marital property can be categorized as separate, community, or mixed. *See Hillery v. Hillery*, 342 S.W.2d 565, 567 (Tex. 1961); *Gleich v. Bongio*, 99 S.W.2d 881, 883 (Tex. 1937). These types of property and the rights and liabilities associated with them are defined in Chapter 3 of the TEXAS FAMILY CODE.

The Code first defines separate property. As is relevant to this case, "separate property consists of: (1) the property owned or claimed by the spouse before marriage; [and] (2) the property acquired by the spouse during marriage by gift, devise, or descent." TEX. FAM. CODE § 3.001(1)–(2). The Code then defines "community property" negatively in relation to separate property. Any "property, other than separate property, acquired by either spouse during marriage" is community property. *Id.* § 3.002.

"There is a presumption under the Family Code that property held during marriage is community property: '[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be community property.'" *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001) (quoting TEX. FAM. CODE § 3.003(a)). The status of a particular piece of property is generally determined by its character at inception. *Id.*

A party wishing to show that a particular piece of marital property is separate property bears the burden of rebutting the community presumption by clear and convincing evidence. TEX. FAM. CODE § 3.003(b). This burden is often met through tracing. "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004). "Separate property will retain its separate character through a series of exchanges so long as" the party can "trac[e] the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character." *Id.* But when property that was separate at its inception is so commingled with community property "as to defy resegregation and identification, the community presumption prevails." *Moroch v. Collins*, 174 S.W.3d 849, 855 (Tex. App.—Dallas 2005). Any doubt as to the character of property should be resolved in favor of the community estate. *Akin v. Akin*, 649 S.W.2d 700, 703 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.).

Texas further divides interests in community property into what are called "management rights." These rights refer to which spouse has the right to actively manage, control, and maintain community property, even though that property is jointly owned. Management rights come in two types: sole management rights and joint management rights. TEX. FAM. CODE § 3.102. By default, community property is subject to joint management. *Id.* § 3.102(c). Community

property is subject to sole management in two circumstances. First, a "spouse has the sole management, control, and disposition of the community property that the spouse would have owned if single." *Id.* § 3.102(a). Second, the spouses may "provide otherwise [*i.e.*, may make the property subject to sole management] by power of attorney in writing or other agreement." *Id.* § 3.102(c).

Regardless of how it is managed, each spouse owns a 50% interest in all community property regardless of which spouse earned or otherwise acquired that property. *Carnes v. Meador*, 533 S.W.2d 365, 371 (Tex. App.—Dallas 1975, writ ref'd n.r.e.).

### B. The Rights of the IRS to Satisfy Debts Using Marital Property

The Government seeks to foreclose on the federal tax liens encumbering the Cost Property pursuant to 26 U.S.C. § 7403, which reads as follows:

> In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability *or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability.*"

*Id.* § 7403(a). This section authorizes the Government to enforce its tax lien against Mr. Orr by seizing and selling any property in which Mr. Orr has any right, title, or interest. In interpreting this section, the Supreme Court has held that a lien cannot extend beyond the property interests held by the delinquent taxpayer. *United States v. Rodgers*, 461 U.S. 677, 690 (1983).

To determine what "right, title, or interest" a delinquent taxpayer has in property, courts must apply state law. *Id.* at 683. Here, that means applying Texas law. In the previous section, the Court laid out Texas's laws concerning the acquisition and characterization of marital property rights.

4

The Court must also consider the Government's—and specifically the IRS's—privileged position as a creditor. Under Texas law, a creditor generally cannot reach a non-liable spouse's community property that is subject to the non-liable spouse's sole management. *Id.* § 3.202(b). The IRS, however, is exempt from that rule. Under 26 U.S.C. § 6321, a delinquent taxpayer's tax liabilities "shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to" the delinquent taxpayer. And § 6331(a) of the same title authorizes "levy upon all property and rights to property . . . belonging to such person." Property exempt from levy is defined in 26 U.S.C. § 6334(a). The Cost Property does not fit within the exemptions described in that section; there is no argument from any party that it does. Section 6334(c) further provides, "Notwithstanding any other law of the United States . . ., no property or rights to property shall be exempt from levy other than the property specifically made exempt by subsection (a)." The Supreme Court calls this language "specific and it is clear and there is no room in it for automatic exemption of property that happens to be exempt from state levy under state law." *United States v. Mitchell*, 403 U.S. 190, 205 (1971). So while Texas may define what rights Mr. Orr has in property, it may not exempt any of those property rights from levy by the IRS.

Taking these laws into consideration, the Court concludes that the only property that the IRS may reach and sell to satisfy Mr. Orr's tax liabilities is all of Mr. Orr's separate property and all property in which he owns a community interest. The IRS may not, however, reach any property that is Mrs. Orr's separate property.

## II. Mr. Orr's Tax Liabilities

As an initial matter, the Court concludes that this suit is procedurally proper and that the federal tax liens attached to the Cost Property are valid.

Mr. Orr failed to file his 2001 federal income tax return or to pay any federal income taxes for that year. Pursuant to 26 U.S.C. § 6020(b)(1), Mr. Orr's 2001 income tax was timely assessed against him on March 10, 2008. Exhibit G33 at 1. Pursuant to 26 U.S.C. § 6502(a)(1), the IRS had ten (10) years from that date to initiate a proceeding in court to collect that tax. The IRS initiated this suit on March 1, 2016, well within the allotted time.

On May 26, 2017, the Court granted summary judgment in the IRS's favor on the issue of Mr. Orr's income tax liability. ECF No. 31. The Court found that Mr. Orr was indebted to the U.S. for his 2001 federal income tax in the amount of $269,289.96, plus penalties, and statutory additions and additional pre-judgment and post-judgment interest from December 1, 2016, until paid, pursuant to 28 U.S.C. § 1961(c)(1) and 26 U.S.C. §§ 6601, 6621(a)(2) and 6622.

As of February 28, 2018, the date of trial, Mr. Orr's total tax debt was $283,0889.66, with penalties, statutory additions, and pre- and post-judgment interest still accruing as applicable. Under 26 U.S.C. § 6321, the IRS filed valid federal tax liens against Mr. Orr that attaches to any right, title, or interest Mr. Orr owns in any property. The IRS also filed nominee liens against Mrs. Orr for any property held by her as nominee of Mr. Orr. And under 26 U.S.C. § 7403, the IRS has properly brought this civil action to enforce those liens.

### III. The Orrs' Argument for Why the Cost Property Is Mrs. Orr's Separate Property.

#### A. The Orrs Bear the Burden of Showing that the Cost Property Is Mrs. Orr's Separate Property.

The Orrs bear the burden of showing that the Cost Property is Mrs. Orr's separate property. In other words, the Orrs bear the burden of showing that the IRS cannot satisfy Mr. Orr's tax liabilities by foreclosing on and selling the Cost Property. This is so because the Orrs acquired the Cost Property in 2006. Exhibits D6, D10–D20. It is uncontested that the Orrs were a married couple in 2006. Therefore, under TEX. FAM. CODE § 3.003, the Cost Property "is presumed to be

community property" and the burden falls on the Orrs to show by "clear and convincing evidence" that the Cost Property is in fact Mrs. Orr's separate property.

### B. The Orrs Argue that the Cost Property is Mrs. Orr's Separate Property Because It Was Acquired Solely with the Proceeds of Mrs. Orr's Separate Property.

The Orrs attempt to meet their burden of showing that the Cost Property is Mrs. Orr's separate property through tracing. In other words, they attempt to "establish[] the separate origin of the [Cost Property] through evidence showing the time and means by which [Mrs. Orr] originally obtained possession of the property." *Boyd*, 131 S.W.3d at 612. The Court now relays the Orrs' story of the separate origin of the Cost Property. The Orrs' story is best organized into three phases: (1) the Orrs' marriage and agreement to keep their property separate, (2) Mrs. Orr's receipt of the Hays Property as a gift from her parents, and (3) Mrs. Orr's § 1031 exchange of the Hays Property for the Cost Property.

### 1) The Orrs Assert that They Agreed to Hold no Community Property and to Keep their Finances Separate Shortly After They Married.

The Orrs married on November 8, 1986. They allege that they agreed, shortly after their marriage, to hold no community property, that they would each hold their respective assets and income as separate property, and that they would keep their finances strictly separate. This agreement was supposedly memorialized in a post-nuptial agreement that was signed on September 9, 1990. Exhibit D1. The agreement reads as follows: "By this agreement Tom Orr and Carolyn Orr each agree to continue to keep all finances separate. This financial separation includes business, personal money, and debts." *Id.* At trial, the Orrs testified that they have been faithful to this agreement throughout their marriage, maintaining separate bank accounts and treating their respective assets and income as separate property.

2) The Orrs Assert that Mrs. Orr received the Hays Property as a Gift from Her Parents and that Mrs. Orr Held the Hays Property as Her Sole and Separate Property.

In the late 1990s, Mrs. Orr's parents, Joe and Kathleen Redinger, gifted 35.293 acres of property in Hays County, Texas (the "Hays Property") to Mrs. Orr. The Redingers made this gift in four installments. In each of the years 1995, 1996, 1997, and 1998, the Redingers executed and recorded identical deeds conveying to Mrs. Orr an undivided one-fourth (1/4) interest in the Hays Property. Exhibits D2–D5. According to the Orrs, upon the execution and recordation of the fourth and final deed, Mrs. Orr owned 100% fee simple interest in the Hays Property.

The Orrs argue that not only did Mrs. Orr own the Hays Property in fee simple, but she also owned it as her sole and separate property. First, the deeds themselves say that the property interests were conveyed to Mrs. Orr as her "sole and separate property and estate." Exhibits D2–D5. Second, she received the Hays Property as a gift from her parents, and gifts received during marriage are the receiving spouse's separate property. TEX. FAM. CODE § 3.001(2). And third, the Orrs agreed at the beginning of their marriage that they would hold no community property.

The Orrs lived together on the Hays Property until 2006, when that property was exchanged for the Cost Property.

3) The Orrs Assert that Mrs. Orr Exchanged the Hays Property for the Cost Property as Part of a § 1031 Exchange.

In 2006, the Orrs decided to sell the Hays Property and purchase a 101.595-acre property in Cost, Texas (the "Cost Property"). The Orrs—allegedly acting on the advice of their attorney—decided to effectuate the sale of the Hays Property and the purchase of the Cost Property via a § 1031 exchange. The Texas 1031 Exchange Company ("Exchange Company") served as the intermediary for this exchange.

The first part of the exchange involved assigning the sale of the Hays Property to Exchange Company. On July 31, 2006, Mrs. Orr assigned the contract relating to the sale of the Hays Property to Exchange Company. Exhibit D11. That same day, Exchange Company—as assignee and intermediary for Mrs. Orr—closed the sale of the Hays Property and received proceeds from that sale in the amount of $560,968. Exhibits D13; D22.

The second part of the exchange involved Exchange Company using the proceeds from the sale of the Hays Property to purchase the Cost Property. On August 2, 2006, Mrs. Orr assigned the contract relating to the sale of the Cost Property to Exchange Company. That same day, Exchange Company—as assignee and intermediary for Mrs. Orr—closed the purchase of the Cost Property. The Exchange Company paid $326,723.19 for the Cost Property, all of which came from the proceeds of the sale of the Hays Property. Exhibits D21–D22. The Cost Property was then deeded solely to Mrs. Orr. Exhibit D23. The remaining cash from the sale of the Hays Property that was not used to purchase the Cost property was also given to Mrs. Orr. Exhibit D22.

## IV. Evidence and Arguments that Fail to Show that the Cost Property Is Community Property.

At trial, the Government did not seem to dispute the general contours of the Orrs' argument—*i.e.*, that Mrs. Orr received the Hays Property from her parents and then attempted to exchange that property for the Cost Property through a § 1031 exchange. But the Government contends that certain details of the Orrs' story are either inaccurate or incomplete. In other circumstances, the parties agree as to certain facts, but disagree as to their legal significance. The Court will now discuss those of the Government's disagreements and arguments that the Court does not believe support its contention that the Cost Property is community property on which the Government may foreclose to satisfy Mr. Orr's tax debts.

*A. The Orrs Made No Valid Agreement to Hold Only Separate Property. The Court Finds the Agreement Presented to the Court Was Fraudulent. But This Conclusion Does Not Affect Any Ownership Interest in Either the Hays or Cost Properties.*

The Orr's very first exhibit is their alleged agreement to hold only separate property and to keep all of their finances separate. Exhibit D1. The Government makes two arguments regarding the alleged agreement. First, it argues that the agreement is not a valid agreement to partition the community estate under the Texas Family Code. Second, it argues that the copy of the agreement submitted as Exhibit D1 is in fact fraudulent. The Court agrees with both of these assessments.

First, even assuming the Orrs' agreement is not fraudulent, it does not constitute a valid partition of the community estate under the Texas Family Code. The agreement contains the necessary formalities, but the content thereof is insufficient to partition the marital estate.

Chapter 4 of the Texas Family Code governs such marital property agreements. *See generally* TEX. FAM. CODE §§ 4.101–106. Section 4.104 provides the formalities to which such agreements are subject. It says that "[a] partition or exchange agreement under [this subchapter] must be in writing and signed by both parties. Either agreement is enforceable without consideration." *Id.* § 4.104. The Orrs' alleged agreement is in writing and signed by both Tom and Carolyn Orr. Therefore, the agreement meets the required formalities.

But though the alleged agreement meets the formalities required of an agreement to partition the marital estate, the content of the agreement itself is insufficient. Section 4.102 of the Family Code reads as follows:

> At any time, the spouses may partition or exchange between themselves all or part of their community property, then existing or to be acquired, as the spouses may desire. Property or a property interest transferred to a spouse by a partition or exchange agreement becomes that spouse's separate property. The partition or exchange of property may also provide that future earnings and income arising

from the transferred property shall be the separate property of the
owning spouse.

*Id.* § 4.102. The Orrs' agreement addresses none of that.

The Orrs' agreement, in full, reads as follows: "By this agreement Tom Orr and
Carolyn Orr each agree to continue to keep all finances separate. This financial separation includes
business, personal money and debts." Exhibit D1. There are several reasons for which this
agreement cannot be read to constitute a general partition of the community estate. First, it does
not once mention the community estate or community property. The agreement does not mention
"community property." It does not mention "separate property." It does not specifically identify
any property, "then existing or to be acquired," that would be of a community nature if not for the
agreement. TEX. FAM. CODE § 4.102. It does not discuss future earnings and income arising from
separate property. All it says is that the Orrs agreed to keep their finances separate. No more, no
less.

Second, it contains no words of transfer or exchange. Instead, it says that the Orrs
agreed "to *continue*" to keep their finances separate. Exhibit D-1 (emphasis added). By using the
word "continue," the Orrs imply that they intended to maintain a status quo, to keep things going
as they were. But a marital agreement partitioning the community estate does not maintain the
status quo. Rather, such an agreement says, "Hitherto this property has been community property,
but no longer."

This conclusion is reinforced when one considers that partitions of the community
estate must be effectuated by a written and signed agreement in the first place. As such, the phrase
"continue to keep all finances separate" in the agreement cannot mean "continue to hold only
separate property" because the agreement itself would be the beginning of the completely separate

estate. Thus, the Orrs' agreement "to continue" doing what they were already doing cannot be construed as an agreement to do something new—disrupt the community property estate.

The preceding analysis shows why the Orrs' agreement, even if it is not fraudulent, is not sufficient to constitute a partition of the community estate. But the Court also concludes that the written and signed agreement included as Exhibit D1 is, more likely than not, fraudulent. Now, when the Court says "fraudulent," it does not mean that the agreement was not prepared and signed by the Orrs. Rather the Court means to say that it believes the agreement is backdated.

The Orrs' agreement is dated September 9, 1990. Exhibit D1. But no original copy of this agreement, to the Court's knowledge, has ever been seen by anyone other than the Orrs. The copy presented to the Court in the binder of the defendants' trial exhibits is not a copy of an original, but a copy of a fax of an original. That fax was sent from HEB #445 on May 6, 2016, twenty-six years after it was supposedly signed, ten years after the Orrs moved to the Cost Property, and two months after the start of this litigation. *Id.* When questioned at trial about the original agreement, though, the Orrs said that they did not know where it was because they had lost it.

So the Orrs want the Court to believe the following: First, that they agreed to keep their finances completely separate when they married in 1986, but did not put this agreement in writing until 1990 (for reasons undisclosed). Second, that the Orrs carefully maintained their only copy of the agreement for 26 years from 1990 until 2016, when this litigation began. Third, that when this litigation began, they dug up the original agreement and faxed it from an HEB to their attorney to use as evidence. To the Court's knowledge, no other piece of evidence in this trial was faxed in this way, yet neither of the Orrs could remember where that HEB was or who exactly sent the fax or why it was the only document faxed. Fourth, that sometime during the course of this

litigation, but after faxing a copy to their attorneys, the Orrs lost the only original copy of their agreement, despite having carefully maintained it for 26 years when it was not a relevant piece of evidence in ongoing litigation. And fifth, that during the entire course of this document's life, no one else ever saw it.

Maybe that is all true. But the Court does not believe it. Maybe there is a good reason for the agreement being the only piece of evidence presented to this Court in the form of a fax. But the Court did not hear it. Maybe there is a good reason for which the Orrs sent the fax from an HEB in Lockhart, TX. But the Court did not hear it. Maybe there is a good reason for which the Orrs could not recount any of the details about the sending of the fax. But the Court did not hear it. And maybe there is a reason the Orrs waited four years to memorialize the agreement they allegedly made at the beginning of their marriage. But the Court also did not hear that.

It is all too convenient. A potentially key piece of evidence that the Orrs have kept for 26 years and that only the Orrs have seen is faxed under mysterious circumstances from an HEB at the start of this litigation and then conveniently lost. Given all of these circumstances, the Court thinks it more likely that the agreement is fraudulent, that the Orrs drafted it for this litigation when they thought it would help their case and backdated it to 1990.

Because the agreement, even if legitimate, does not affect the community estate, these conclusions do not directly bear on the outcome of this case. But the strange circumstances surrounding the agreement and its presentation to the Court, which indicate to the Court that the agreement is most likely fraudulent, are damning to the credibility of the Orrs as witnesses.

### B. Mr. Orr Signed Some of the Documents Related to the § 1031 Exchange. These Signatures Do Not Affect the Ownership Interests in the Cost Property.

It is undisputed that Mr. Orr signed some of the documents related to the § 1031 exchange. In particular, Mr. Orr signed documents relating to the sale of the Hays Property and

the purchase of the Cost Property. Exhibit D6 (the contract to purchase the Cost Property, signed by Mr. Orr). The Government cites this as evidence that the Hays Property was community property in which Mr. Orr held an ownership interest. If that is so then the Cost Property would also be community property.

But Mr. Orr's signatures on the documents relating to the sale of the Hays Property do not evidence that the Hays Property was community property. It is well established under Texas law that a spouse may have a homestead interest in a residence that is the separate property of the other spouse. And under Section 5.001 of the Texas Family Code, "neither spouse may sell, convey, or encumber the homestead without the joinder of the other spouse" even if "the homestead is the separate property" of one spouse. TEX. FAM. CODE §5.001. Thus, even if the Hays Property sold as part of the § 1031 exchange was Mrs. Orr's separate property, Mr. Orr would be required under Texas law to join in its sale. Mr. Garon Horton, an experienced Texas fee attorney who testified as an expert for Mrs. Orr, testified that Texas real estate practice accommodates this legal requirement by customarily including both spouses on documents related to the sale of a primary residence regardless of whether that residence is the separate property of one spouse or the community property of both. This practice ensures that neither spouse retains a homestead interest in the sold property.

What happened in this case reflects that practice. Even assuming that the Hays Property was entirely Mrs. Orr's separate property, the property was Mr. Orr's homestead. Therefore, Mrs. Orr could not sell the Hays Property without Mr. Orr's joinder. And Mr. Orr signed the sale documents to indicate his joinder in the sale. Nothing about this is unusual or indicates that Mr. Orr owned any interest in the Hays Property.

For these reasons, the Court concludes that Mr. Orr's signing documents relating to the sale of the Hays Property and the § 1031 exchange do not, as a matter of law, evidence that the Hays Property was community property or that Mr. Orr otherwise had any ownership interest in the Hays Property.

### C. The Deed Conveying the Cost Property Did Not Expressly State that It Was Her Separate Property. It Also Did Not Need To.

It is undisputed that the deed conveying the Cost Property to Mrs. Orr does not expressly state that Mrs. Orr was taking title to the Cost Property as her sole and separate property. Exhibit D23. The Government argues that this shows that the Cost Property is actually community property. It does not.

When a deed contains a representation that the realty is a spouse's separate property, there is a presumption that the realty is, in fact, separate property. *See Pemelton v. Pemelton*, 809 S.W.2d 642, 646 (Tex. App.—Corpus Christi 1991) *rev'd on other grounds by Heggen v. Pemelton*, 836 S.W.2d 145 (Tex. 1992). But this does not mean that a deed must explicitly state that the realty is separate property in order for the recipient to receive it as separate property. Property does not become community property just because the deed does not call it separate property.

Here, the deed conveying title in the Cost Property to Mrs. Orr does not say that the property is Mrs. Orr's sole and separate property. That only means that there is no presumption that the property is Mrs. Orr's sole and separate property. It is not evidence that the property is community property.

### D. Mr. Orr Signed Homestead Affidavits Claiming the Hays Property as His Homestead. This Is Not Evidence that the Cost Property Is Community Property.

It is undisputed that Mr. Orr signed affidavits claiming the Hays Property as his homestead. The Government argues that this is evidence that the Hays Property was community

property, which would make the Cost Property (acquired with the proceeds of the Hays Property) community property as well. This is not so.

As the Court has already said, it is clear under Texas law that a spouse may have a homestead interest in the separate property of the other spouse. As such, the mere fact that Mr. Orr claimed a homestead interest in the Hays Property does not evidence that he had or claimed any other ownership interest in the Hays Property.

### E. Mr. Orr Listed the Cost Property on His Form 433-A. This Is Not Evidence that the Cost Property Was Community Property.

As part of the IRS's efforts to assess and collect Mr. Orr's unpaid taxes, the IRS had Mr. Orr fill out a Form 433-A. On this form, Mr. Orr listed assets in his and his wife's possession. The Cost Property was included on this list, but was not identified as separate property. The Government argues that this shows that the Cost Property is community property. Not so.

As this Court said at an earlier stage of this litigation, Form 433-A asks for information concerning both the taxpayer (Mr. Orr) and the taxpayer's spouse (Mrs. Orr). Order Regarding Summary Judgment, *United States (IRS) v. Orr*, No. 16-cv-218, 2017 WL 2999708 at n.2 (W.D. Tex. May 26, 2017). The form does not ask taxpayers to differentiate between community and separate property. *Id.* The form is not itself a muniment of title. And a taxpayer cannot create property interests where there previously were none merely by listing an asset on the form. Thus, Mr. Orr's inclusion of the Cost Property on his form is not actual evidence of legal ownership interest in that property or evidence that the property is community, as opposed to separate, property.

*F. The Parties Dispute Whether the Hays Property Was a Gift from Mrs. Orr's Parents to Mrs. Orr. The Court Finds that at Least the Initial 35.293-Acre Parcel Was a Gift.*

It is undisputed that Mrs. Orr received the Hays Property (at least 35.293 acres of it[1]) from her parents. But the parties disagree as to the nature of that conveyance. The Orrs assert that the land was given as a gift. The Government contends that the property was not a gift. If the Government is right, and the Hays Property was not given to Mrs. Orr as a gift, then the Hays Property—and, by extension, the Cost Property—would be community property.

The Government argues that the Hays Property was not given to Mrs. Orr as a gift because the four deeds conveying the Hays Property to Mrs. Orr were not gift deeds. Each deed contains a section entitled "Consideration." Exhibits D2–D5. And each deed recites that the following consideration was given in exchange for the property interests conveyed by the deed: "Ten Dollars and other valuable consideration to the [Redingers] paid by [Mrs. Orr], the receipt of which is hereby acknowledged." *Id.* The Government argues that this language shows that the Hays Property was not conveyed to Mrs. Orr as a gift because the donative intent required to establish a gift is lacking where consideration is given for the property.

It is uncontested the deeds from Mrs. Orr's parents to Mrs. Orr are not gift deeds and that the deeds contain the consideration language given above. But the Court disagrees that the mere failure to use a gift deed and the inclusion of boilerplate consideration terms is enough, in this case, to show that the conveyances were not gifts. In Texas, "[w]hen a person conveys property to a natural object of the grantor's bounty, such as a parent to a child, it creates a presumption that the property conveyed is a gift. *Kyles v. Kyles*, 832 S.W.2d 194, 197 (Tex. App.—Beaumont 1992) (citing *Equitable Trust Co. v. Roland*, 721 S.W.2d 530, 533 (Tex. App.—

---

[1] The Court says "at least" this 35.293-acre portion because the Hays Property includes an additional 1.33-acre portion, the status of which is not as clear and which will be discussed in detail later in the opinion.

Corpus Christi, writ ref'd n.r.e.). This presumption is rebuttable, "but the person claiming that the property was not a gift must prove the lack of donative intent by clear and convincing evidence." *Id.* (citing *Somer v. Bogart*, 749 S.W.2d 202, 204 (Tex. App.—Dallas). The Court finds that failing to use gift deeds and including perfunctory, boilerplate language concerning consideration in those deeds is not clear and convincing evidence that Mrs. Orr's parents lacked donative intent. Therefore, the Court finds that Mrs. Orr did receive the initial 35.293 acres of the Hays Property as a gift from her parents. And as a gift, Mrs. Orr took possession of those acres as her sole and separate property.

### G. Mrs. Orr's § 1031 Exchange Was Improper. But That Conclusion Is Irrelevant to This Case.

The Government asserts that the § 1031 exchange that Mrs. Orr used to swap the Hays Property for the Cost Property and cash boot was improper. That is correct. Only "real property held for productive use in a trade or business or for investment" is eligible for tax-deferred treatment under the Internal Revenue Code. 26 U.S.C. § 1031(a)(1). But Mrs. Orr used the Hays Property as her primary residence and continues to use the Cost Property as her primary, personal residence. And "[i]t has long been the rule that use of property solely as a personal residence is antithetical to its being held for investment." *Starker v. United States*, 602 F.2d 1341, 1350 (9th Cir. 1979) (*quoted in Moore v. C.I.R.*, T.C. Memo. 2007-134, 2007 WL 1555852 at *10). Even an argument that Mrs. Orr used the properties partially for business activities such that they were not used *solely* as personal residence would not legitimize the exchange because "[i]t is a taxpayer's *primary* purpose in holding the properties that counts." *Moore*, 2007 WL 1555852 at *10 (emphasis in original) ((citing *Montgomery v. C.I.R.*, T.C. Memo. 1997-279, 1997 WL 337117 at *9) (rev'd on other grounds on appeal by 300 F.3d 866 (10th Cir. 1999))). And the primary purpose for which Mrs. Orr held the Hays Property and holds the Cost Property is not for business

or investment, but as her personal residence.[2]  As such, the properties were ineligible for tax-deferred treatment under a § 1031 exchange.

But the propriety of the § 1031 exchange has no effect on the outcome of this case.  Tax liability for capital gains realized from the sale of the Hays Property are not at issue in this case.  At issue is whether the Cost Property is Mrs. Orr's separate property and whether the Cost Property may be forcibly sold to satisfy Mr. Orr's tax liability.  In examining that issue, the relevance of the § 1031 exchange is not whether the exchange itself was proper, but whether the use of the exchange mechanism provides clear and convincing evidence that the funds used to purchase the Cost Property flowed directly from the Sale of the Hays Property.  And the Court finds that the use of the exchange mechanism does show that the Cost Property was purchased using funds that flowed directly from the sale of the Hays property.  The propriety of the exchange does not change that analysis.

### H. The Court Finds that Mrs. Orr Did Not Gift Any Interest in the Cost Property to Mr. Orr.

The Government argues that the Cost Property is community property because Mrs. Orr somehow gifted interest in the property to Mr. Orr.  This argument is unsupported by any evidence brought out at trial.

A gift has three elements: (1) the intent to make a gift, (2) delivery of the property, and (3) acceptance of the property.  *Grimsley v. Grimsley*, 632 S.W.2d 174, 177 (Tex. App.—Corpus Christi 1982).  There is no evidence that Mrs. Orr intended to make a gift of any ownership interest in the Cost Property or that she delivered such an interest even if she had the intent so to gift it.

---

[2] Perhaps there are portions of the respective properties that were used primarily for business or investment purposes.  But deciding that question is unnecessary given that additional tax liabilities are not at issue in this case.

Rather, Mrs. Orr took title to the Cost Property in her name only. This evidences her intent to hold the property solely in her own name and not to share ownership of the property with Mr. Orr.

There also is no evidence that Mrs. Orr delivered any ownership interest in the Cost Property to Mr. Orr. Conversions of separate property to community property in Texas are governed by Section 4.202 of the Family Code. That section says that, "[a]t any time, spouses may agree that all or part of the separate property owned by either or both spouses is converted to community property." TEX. FAM. CODE § 4.202. Such agreements must be accompanied by certain formalities. First, it is not enough merely to transfer a spouse's separate property into the name of the other or both spouses. *Id.* § 4.203(b). Such a transfer will not convert the separate property to community property. *Id.* Second, such agreements must be written, must be signed by both spouses, must identify the property being converted, and must specify that the property is being converted to community property. *Id.* § 4.203(a)(1). The Government produced no agreement at trial meeting these qualifications. Nor did the Government produce any other evidence showing that Mrs. Orr delivered a community ownership interest in the Cost Property to Mr. Orr.

Because there is no evidence that Mrs. Orr intended to gift a community ownership interest in the Cost Property to Mr. Orr nor that Mrs. Orr delivered any such interest to Mr. Orr, the Court concludes that Mrs. Orr did not make a gift of any portion of the Cost Property to Mr. Orr.

### I. Certain of the Government's Commingling Arguments Fail.

The Government argues that the Cost Property is community property because the Orrs have commingled their assets to the extent that they can no longer be separated and apportioned between them. *See Moroch*, 174 S.W.3d at 855. The Government provides several theories by which it claims the Orrs commingled their assets, most of which fail. In this section, the Court

briefly discusses those failed theories: (1) that the Orrs' assets were commingled when Mr. Orr contributed labor to the construction and renovation of the houses on the two properties and performed maintenance and repair work on the properties, (2) that the Orrs' assets were commingled when Mrs. Orr allowed Mr. Orr to keep cattle on the Cost Property to generate income, and (3) that the Orrs' assets were commingled when the Orrs filed joint tax returns on several occasions over the past few decades.

### 1) Mr. Orr's Sweat Equity in the Properties Does Not Create Any Ownership Interest.

The Government asserts that Mr. Orr made capital improvements to the two properties and also that he performed normal maintenance and repair work on the properties. The Government argues that these labors constitute a commingling of the Orrs' assets and transformed the properties into community property.

It is uncontested that Mr. Orr has put some amount of sweat equity into the Hays and Cost Properties. He performed routine maintenance on fences and other features of the properties. He constructed or helped construct various buildings on the properties. He even helped to build the dwelling on the Hays Property. The parties disagree about the exact amount of work that Mr. Orr put into all of these projects, but these disagreements are irrelevant. The Court finds, as a matter of law, that Mr. Orr's labor spent improving the properties does not give rise to any ownership interest in them or convert what would otherwise be separate property into community property. Therefore, it is unnecessary to determine the exact amount of work he put into each property.

Texas law is clear on this matter. Funds expended by one marital estate to benefit another marital estate may give rise to claims for equitable reimbursement upon death or divorce. TEX. FAM. CODE § 3.402(d) ("Reimbursement for funds expended by a marital estate for

21

improvements to another marital estate shall be measured by the enhancement in value to the benefited marital estate."); *see also id.* § 3.402(a)(8) ("For purposes of this subchapter, a claim for reimbursement includes: . . . (8) capital improvement to property other than by incurring debt."). But such expenditures do not create any ownership interests in the property improved. *Id.* § 3.404(b) ("A claim for reimbursement under this subchapter does not create an ownership interest in property . . . ."). Instead, Texas adheres to a strict inception-of-title rule "under which the character of property is determined at the time the right to own or claim the property arises." *Id.* § 3.404(a).

Here, there is no actual evidence that Mr. Orr expended funds to improve the properties at all. Rather, he contributed labor. That labor, especially the labor that contributed to the capital improvement of the property, could give rise to such an equitable claim in the event of death or divorce. But there is no reason to conclude that contributions of labor change the ownership characteristics of property any more than contributions of funds. Therefore, if the properties were Mrs. Orr's separate property at each's time of inception, Mr. Orr's labors improving the properties could not convert the properties to community property. As such, the Orrs did not commingle their assets through Mr. Orr's labors.

### 2) Mr. Orr Kept Cattle on the Properties for Personal and Business Purposes, But These Activities Do Not Constitute Commingling of Assets.

Much time was spent at trial establishing the extent to which Mr. Orr raised cattle or conducted other business activities on the Hays and Cost Properties. While Mr. Orr certainly utilized both properties to raise cattle and appears to have sold grass or hay produced on the Cost Property for profit, the Government has not asserted a sound legal basis for concluding that these activities constitute commingling of assets that would change the character of the properties. As the Court mentioned earlier, Texas adheres to a strict inception-of-title rule "under which the

character of property is determined at the time the right to own or claim the property arises." TEX. FAM. CODE § 3.404(a); *see also Barnett*, 67 S.W.3d at 111; *Moroch*, 174 S.W.3d at 856. The Government has not set forth any legal authority saying that a spouse's separate property becomes community property when the other spouse uses that separate property for his use, enjoyment, or even business operations. The reason for this is clear—such a rule would go beyond the requirement that separate property not be commingled and instead require that one spouse's separate property be isolated from the other spouse entirely. Such a rule would be absurd.

For these reasons, the Court finds that Mr. Orr's use of the Properties to raise cattle or conduct other business activities does not constitute commingling and could not change separate property to community property.

### 3) The Orrs Filed Several Joint Tax Returns During Their Marriage; But Filing a Joint Tax Return Is Not Commingling of Assets.

The filing of a tax return is a rare event in the Orr household. But it did happen on occasion; and it is uncontested that the Orrs filed several joint tax returns over the course of their marriage. The Government argues that filing these joint tax returns either constitute commingling of assets such that the Hays Property (which the Orrs owned at the time of the joint tax returns) became community property. The Court disagrees.

Merely filing a joint tax return does not constitute commingling assets and does not affect the character of assets owned by the spouses. That is a conclusion of law that has been reached by numerous courts. *See, e.g., Ragan v. C.I.R.*, 135 F.3d 329, 333 (5th Cir. 1998) ("A joint tax return does not create new property interests for the husband and wife . . . ."); *Callaway v. C.I.R.*, 231 F.3d 106, 117 (2d Cir. 2000) ("The filing of joint tax returns does not alter property rights between a husband and a wife."); *In re Wetteroff*, 453 F.2d 544, 547 (8th Cir. 1972) ("Congress most definitely did not intend § 6013(a) [providing for joint tax returns] to affect or

change the ownership of property rights between taxpayers."). Therefore, the Orrs' occasional filing of joint tax returns did not affect the character of the Hays Property and could not affect the character of the Cost Property.

## V. Successful Arguments—The Cost Property Is Community Property on which the Government May Foreclose to Satisfy Mr. Orr's Tax Debts.

The preceding section addressed those of the Government's arguments that fail to show that the Cost Property is community property. This section addresses the Government's successful arguments. These arguments show the flaws in the Orrs' attempt to establish the separate origin of the Cost Property through tracing. These flaws reveal that the Cost Property was not acquired exclusively with Mrs. Orr's separate property. Rather, the Cost property was acquired with a mixture of Mrs. Orr's separate property, Mr. Orr's separate property, and a portion of community property. Because the Orr's commingled their property when acquiring the Cost Property, the Cost Property itself is community property on which the IRS may foreclose to satisfy Mr. Orr's tax debts.

### A. Mr. Orr Paid Earnest Money Deposits for the Cost Property. Therefore, the Cost Property Is Community Property.

It is undisputed that Mr. Orr paid two earnest money deposits for the Cost Property. The first deposit of $3,250 was paid on June 21, 2006, via a check from Mr. Orr's separate bank account. ECF No. 57 at 5, ¶ 18. The second deposit of $2,000 (paid to extend the closing date) was paid on July 18, 2006, also via a check from Mr. Orr's separate bank account. ECF No. 57 at 5, ¶¶ 20–21. The question is whether these deposits gave Mr. Orr an ownership interest in the Cost Property.

In a typical case, the answer would be "no." Under Texas law, when one spouse provides separate property as consideration for real property and title to that real property is taken in the name of the other spouse, the consideration is presumptively a gift, and the real property is

the receiving spouse's separate property. *Pemelton v. Pemelton*, 809 S.W.2d 642, 646 (Tex. App.—Corpus Christi 1991) ("Proof that the property was acquired by gift during the marriage may rebut the community presumption. A presumption of separate property arises when . . . one spouse furnishes separate property consideration and title is taken in the name of the other spouse . . . .") (internal citations omitted), *rev'd on other grounds by Heggen v. Pemelton*, 836 S.W.2d 145 (Tex. 1992); *see also In re Hinsley*, 149 F.3d 1179, No. 97-20967, 1998 WL 414302 at *12, n.11 (5th Cir. July 15, 1998) (acknowledging this point of Texas law). Here, Mr. Orr provided money from his own, separate bank account as partial consideration for the Cost Property, to which Mrs. Orr took title in her name alone. Therefore, the earnest money deposits that Mr. Orr made were presumptively gifts to Mrs. Orr. Money gifted to Mrs. Orr would be her separate property and would not compromise the separate character of the Cost Property.

But this is not a typical case. Here, the Orrs' own testimony defeats the presumption that Mr. Orr's payments were gifts. At trial, both Mr. and Mrs. Orr testified (1) that Mrs. Orr repaid Mr. Orr for both of the earnest money deposits and (2) that Mr. Orr paid the earnest money deposits for the sake of convenience. This testimony is incompatible with the argument that Mr. Orr gifted the funds to Mrs. Orr—gifts, by their very nature, are given with donative intent, without consideration, and are not repaid. *See Williams v. McKnight*, 402 S.W.2d 505, 508 (Tex. 1966) ("Consideration precludes the idea of a gift."), *superseded on other grounds by constitutional amendment as stated in Holmes v. Beatty*, 290 S.W.3d 852 (Tex. 2009); *Kunkel v. Kunkel*, 515 S.W.2d 941, 946 (Tex. App.—Amarillo 1974, writ ref'd n.r.e.) ("[L]ack of consideration [is] an essential characteristic of a gift."). Having represented to the Court that the earnest money deposits were repaid (*i.e.*, there was consideration) and for the sake of convenience rather than with

donative intent, the Orrs cannot now take the position that the earnest money deposits were paid by Mr. Orr as a gift to Mrs. Orr.

Because the Court concludes that Mr. Orr's earnest money payments were not gifts, the Court must address another question: whether it believes that the payments were actually repaid. In short, the Court does not. The only evidence of repayment is the testimony of Mr. and Mrs. Orr. As mentioned in Section III.A., the Court does not believe the Orrs are credible witnesses in general. And in this specific instance, the Court finds additional reasons not to credit their testimony. While both Orrs testified that the earnest money deposits were repaid, neither testified as to when or how those repayments happened. All at once? In installments? By check? In cash? The Orrs did not say. This lack of detail indicates to the Court that the repayments were not made at all.

Further, no evidence corroborating the Orrs' testimony was presented at trial. The Government produced images of the exact checks that Mr. Orr used to pay the earnest money deposits. But the Orrs produced nothing. They did not produce for the Court any check(s) from Mrs. Orr to Mr. Orr in the amount of the earnest money deposits. They did not produce bank statements showing Mr. Orr's bank account ever increased by an amount similar to the earnest money deposits. They did not produce bank statements showing Mrs. Orr's bank account ever decreased by an amount similar to the earnest money deposits. They did not produce wire statements showing that Mrs. Orr transferred money to Mr. Orr electronically. They produced nothing at all that would indicate that money owned by Mrs. Orr ever returned to Mr. Orr. Unless Mrs. Orr happened to have $5,250 in cash lying around with which to repay Mr. Orr, the Court

does not see how two individuals who claim to keep completely separate finances could exchange $5,250 between them without creating any record.[3]

Given the lack of weight the Court gives to the Orrs' testimony and the complete absence of any evidence corroborating their testimony, the Court finds that Mrs. Orr did not repay Mr. Orr.

On the surface, there may seem to be tension in the Court's findings. The Court concludes (1) that the deposits were not gifts because the Orrs testified that Mrs. Orr repaid them, (2) that Mrs. Orr did not in fact repay the deposits, and (3) that the deposits were still, nonetheless, not gifts. But there is no tension here. Just because the Orrs' repayment story is not true does not mean that the gift presumption returns to save them. It is not the fact of repayment that would overcome the gift presumption. Rather, it is the act of taking the position of repayment. Just because that position is a lie does not change the fact that the Orrs took that position in the first place. Taking that position is, in and of itself, proof that the Orrs did not intend the deposits as gifts. If they had been intended as gifts, the Orrs could simply have said so. Instead, throughout the entire course of this litigation, the Orrs have taken the position that the deposits were not gifts, but rather loans that were repaid.

The Orrs themselves repudiated the gift presumption. Having done so, they cannot now claim its benefits. The Court concludes that the earnest money deposits were not intended as gifts, which is why the Orrs had to come up with the repayment story. That the repayment story is false does not magically impute donative intent to Mr. Orr's original payments. In short, the Court finds (1) that Mr. Orr never gifted the funds to Mrs. Orr (because there was no donative intent), and (2) that Mrs. Orr never actually repaid Mr. Orr.

---

[3] And to be clear, there is neither evidence nor contention that Mrs. Orr repaid Mr. Orr in cash.

These conclusions have two implications. First, they provide another instance of the Orrs being untruthful. Second, they show that a portion of the purchase price of the Cost Property was paid for with Mr. Orr's separate funds—funds that were not gifted to Mrs. Orr and not repaid to Mr. Orr. Because the Cost Property was not acquired solely with Mrs. Orr's separate property, her attempt at tracing fails. The Court finds that the Cost Property was acquired with a mixture of Mr. Orr's separate funds and Mrs. Orr's separate funds. Those funds are now so commingled in the Cost Property "as to defy resegregation and identification . . . ." *Moroch v. Collins*, 174 S.W.3d at 855. Therefore, the Cost Property is community property.

### B. The Hays Property Included 1.33 Acres of Community Property. Therefore, the Cost Property Is Also Community Property.

As the Court concluded earlier in this opinion, Mrs. Orr's parents gifted a parcel of land in Hays County, Texas, to Mrs. Orr through four separate deeds. Exhibits D2–D5. Each of these deeds described the land being gifted as containing 35.293 acres of land.

But the property that the Orrs exchanged for the Cost Property consisted of more than 35.293 acres of land. As part of the § 1031 exchange, the Orrs executed three warranty deeds transferring title to the Hays Property to Mr. Ted Karam. The first deed transferred 12.000 acres of land. Exhibit G21. The second deed transferred 13.598 acres of land. *Id.* And the third deed transferred 10.983 acres of land. *Id.* In total, then, the three deeds purport to transfer title to 36.581 acres of land, 1.288 more acres than Mrs. Orr's parents gifted to Mrs. Orr.

The source of the additional land is clear on the face of the three warranty deeds that the Orrs provided to Mr. Karam. Each of the three deeds states that the land conveyed therein consisted in part of the 35.293 acres of land that Mrs. Orr's parents gifted to Mrs. Orr, and in "part of that tract of land said to contain 1.33 acres of land as described in a quitclaim deed to Tom Orr and Carolyn R. Orr from FSP Development of Texas, L.L.C., dated April 15, 2002, and recorded

in Volume 1983, Page 324, of the official public records of Hays County, Texas.." *Id.* The extra

land given to Mr. Karam was this 1.33-acre tract that was quitclaimed to both Mr. and Mrs. Orr.[4]

It appears from the deeds, then, that the land transferred to Mr. Karam—the same land

that was exchanged for the Cost Property—consisted not only of Mrs. Orr's 35.293 acres of

separate property, but of this 1.33-acre tract as well. This 1.33-acre tract was (1) acquired during

the Orrs' marriage and (2) quitclaimed to *both* Mr. and Mrs. Orr. These two facts give rise to the

presumption that the 1.33-acre tract was the Orrs' community property. *See* TEX. FAM. CODE §

3.003(a) ("Property possessed by either spouse during or on dissolution of marriage is presumed

to be community property."). If that presumption withstands scrutiny, then the Cost Property is

also community property because it was acquired with the proceeds of the Hays Property,

including this 1.33-acre tract.

It is the Orrs' burden to show that this 1.33-acre tract was not community property. *Id.*

§ 3.003(b) ("The degree of proof necessary to establish that property is separate property is clear

and convincing evidence."). The Orrs attempt to do this in two ways. First, they argue that there

is insufficient evidence to show that the quitclaim deed conveyed any title to Mr. Orr. Second,

they argue that the evidence shows that Mrs. Orr already owned the 1.33-acre tract in fee simple

as her separate property before the quitclaim deed was ever drawn. The Court rejects both of these

arguments.

1) The Quitclaim Deed Is Relevant Because It Raises the Possibility that Mr. Orr Owned 1.33 Acres of the Property Used to Acquire the Cost Property. The Orrs Bear the Burden of Showing that Mr. Orr Did Not Hold Any Title to those Acres.

The Orrs first argue that the quitclaim deed is entirely irrelevant to these proceedings

because the Government set out no additional evidence that the quitclaim deed actually "passed

---

[4] The Court considers the difference between 1.288 acres and 1.33 acres small enough as to be inconsequential.

title of a portion of the Hays County Property to Mr. Orr." ECF No. 61 at 2. This argument fails because it ignores the burden of proof in this case. It is the Orrs who must show that the quitclaim deed did not pass title. The Government need not prove that the quitclaim deed did pass title.

A quitclaim deed is a "deed that conveys a grantor's complete interest or claim in certain real property but that neither warrants nor professes that the title is valid." *Quitclaim Deed*, BLACK'S LAW DICTIONARY (10th ed. 2014). In essence, a quitclaim deed says, "I give to you whatever interest I own; but I don't promise that I own any interest at all." As such, whether a quitclaim deed conveys title depends on whether the grantor possesses title—if the grantor has title, then the quitclaim deed conveys that title; if the grantor does not have title, then the quitclaim deed conveys nothing. Because of this, quitclaim deeds "are commonly used to convey 'interests of an unknown extent or claims having a dubious basis.' A quitclaim deed conveys upon its face doubts about the grantor's interest." *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 487 (Tex. 2005) (quoting *Porter v. Wilson*, 389 S.W.2d 650, 654 (Tex. 1965).

It is well established that under Texas law "[a] quitclaim deed is not a conveyance or a muniment of title" capable of proving title in the grantee. *Rogers v. Ricane Enters.*, 884 S.W.2d 763, 769 (Tex. 1994).[5] Rather, additional evidence is needed, in addition to the quitclaim deed, to prove that the bearer of the quitclaim deed owns title. This additional evidence must show that the quitclaim deed's grantor possessed any title to the property, *Jackson v. Wildflower Production Co.*, 505 S.W.3d 80, 89 (Tex. App.—Amarillo 2016, pet. denied), because only if the grantor possessed title to the property could the quitclaim deed convey title to the property.

---

[5] It seems to be from this line that the Orrs conclude that "a quitclaim deed, by itself, does not convey title." ECF No. 61 at 2. But that is wrong. By itself, a quitclaim deed does convey whatever title the grantor had. But a quitclaim deed, by itself, is not enough to prove title in the grantee in the event of a dispute. That is why a quitclaim deed is not a muniment of title. A muniment of title is "[d]ocumentary evidence of title, such as a deed or a judgment regarding the ownership of property," that is itself sufficient to prove that the bearer holds title. *Muniment of Title*, BLACK'S LAW DICTIONARY (10th ed. 2014). So a quitclaim deed is sufficient to *convey* whatever title the grantor has; but that same deed is insufficient to *prove* title in the grantee.

In this case, that means we must look to FSP, the quitclaim deed's grantor. If FSP had any title to the quitclaimed 1.33 acres, then Mr. Orr likewise had title to those 1.33 acres by virtue of the quitclaim deed. If FSP did not have any title to the 1.33 acres, then Mr. Orr likewise had no title. The question is whether the Orrs bear the burden of showing that FSP did not have title or whether the Government bears the burden of showing that FSP did have title.

Given the posture of this case, the Court concludes that the Orrs bear the burden of showing that FSP did not have title to the quitclaimed 1.33 acres. The Orrs acquired the Cost Property during their marriage. Therefore, the Cost Property is presumptively community property and it is the Orrs' burden to show, by clear and convincing evidence, that the Cost Property is Mrs. Orr's separate property. TEX. FAM. CODE 3.004. The Orrs attempt to meet their burden through tracing. That task of tracing involves showing that the Cost Property was acquired solely with Mrs. Orr's separate property. So the Orrs must show by clear and convincing evidence that the property used to acquire the Cost Property was Mrs. Orr's sole and separate property.

The property used to acquire the Cost Property includes these 1.33 acres. *See* Exhibit G21. Therefore, the Orrs bear the burden of showing that these 1.33 acres were Mrs. Orr's sole and separate property. It is they who must show, by clear and convincing evidence, that Mr. Orr did *not* hold any title to those 1.33 acres. This means that the burden is on the Orrs to show that FSP, as grantor, did *not* possess title to that land; not on the Government to show that FSP did possess title.

In short, the Government need not prove that Mr. Orr possessed title to the 1.33 acres. The Orrs must prove that he did not. And while a quitclaim deed on its own is not sufficient evidence to prove that Mr. Orr possessed title, a quitclaim deed on its own is likewise not clear and convincing evidence that he did not possess title. Put another way, the fact that FSP gave to

Mr. Orr a quitclaim did does not prove that FSP had title to the 1.33 acres; but it also does not provide clear and convincing evidence that FSP did not have title to that land. Therefore, the quitclaim deed is relevant, and the Orrs must provide additional evidence showing by clear and convincing evidence that FSP, as grantor, did not have any title to pass to Mr. Orr.

2) The Orrs Fail to Show that FSP Did Not Possess Title to the 1.33 Acres or that Mrs. Orr Already Owned those Acres in Fee Simple Prior to the Quitclaim Deed.

The Orrs argue that FSP did not possess any title to transfer to Mr. Orr because Mrs. Orr already owned the quitclaimed land in fee simple. ECF No. 61 at 4. To evaluate this argument, we must first be entirely clear about exactly what land is described by the various deeds in this case. The deeds given to Mrs. Orr by her parents as a gift describe the southern boundary of the Hays Property in this way:

> THENCE continuing along the west R.O.W. line of F.M. Highway 150, same being an east line of the said Price tract, S 3°46'30" E 126.09 ft. to an iron rod found for the Northeast corner of that certain (65.05 Acre) tract of land conveyed to G. Gram Poole and his wife, Donna A. Poole by deed recorded in Vol. 938 Pg. 11 of the Official Records of Hays County, Texas, for the Southeast corner of this tract; [here begins the description of the southern boundary, beginning at this southeast corner]
>
> THENCE along the north line of the said Poole tract, the following three (3) courses:
>
> (1) S 51°50'10" W 266.15 ft. to an iron rod found;
> (2) S 75°51'21" W 488.85 ft.;
> (3) N 81°52' 58" W 830.75 ft. to a point at the Northwest corner of the said Poole tract, for an angle point in this tract;
>
> THENCE N 78°01'02" W 151.46 ft. to a point in the approximate centerline of a creek, for an angle point in this tract;
>
> THENCE continuing along the approximate centerline of said creek, currently inundated, the following two (2) courses:
>
> (1) N 58°08'42" W 308.89 ft.;

      (2) N 69°27'36" W 16.76 ft. to a point for the Westerly corner of
          this tract;

Exhibits D2–D5.  Replacing the degree notation and archaic language, these calls describe the

southern boundary of the property gifted to Mrs. Orr by her parents in these steps:

    (1) beginning at the southeast corner of the property, then

    (2) running roughly southwest for 266.15 ft. along the northern line of the property owned by
        FSP to the south (the Poole Tract, which later came to be owned by FSP) to an iron rod
        (this iron rod is in the centerline of a creek, as we learn from the quitclaim deed), then

    (3) running from that iron rod 488.85 ft. in a west-southwesterly direction, then

    (4) running almost due west from that point for another 830.75 ft. (the quitclaim deed clarifies
        that this point is also marked with an iron rod), then

    (5) running from that point almost due west again for another 151.46 ft. to the center of a creek,
        and then

    (6) following that creek roughly west-northwest for another 325 ft.

The Court will use these six (6) steps and the points and bearings described therein as points of

reference throughout this section.

         Mrs. Orr says that this description establishes that she "owned the property north of the

centerline of the creek." ECF No. 61 at 5.  That's not entirely accurate.  The description does not

show that she owned all property north of the entire creek.  It shows that she owned the property

to the north of a roughly 325 ft. segment of the creek—step 6 from the list above—starting at the

point of the creek mentioned in step 5 and running west.  To the east of that point, the deed does

not set the creek as the southern border of her property (either its centerline or its banks).  Instead,

going from west to east, the southern border departs from the creek, cutting across dry land for

several calls until it meets up with the creek again at the iron rod in step 2.

         In other words, the iron rod in step 2 and the point in step 5 are in the same creek.  But

between those two points the southern border of Mrs. Orr's land does not follow the meanders of

the creek. Instead, the border cuts across dry land, leaving a section of land caught between the border described in the deed to the north and the creek to the south. This section of land was part of the Poole Tract (later owned by FSP). It is this land between Mrs. Orr's tract and the creek that FSP quitclaimed to Mr. and Mrs. Orr.

The quitclaim deed begins with this:

> BEGINNING at a ½ inch iron rod found in the centerline of an earthen dam on York Creek, said iron rod being an angle point in the north line of said Poole Tract, and an angle point in the south line of a called 35.293 acre tract conveyed to Carolyn Orr in Volume 1221, Page 11, Official Public Records of Hays County, Texas, from which the northeast corner of said Poole Tract and the southwest corner of said Orr Tract bears N 51°45'20" E, 266.08 feet and being the point of beginning;

Exhibit G52. The iron rod described here is the same iron rod described in step 2 above. We know this because it says that the border between the Poole Tract and Mrs. Orr's tract runs roughly northeast from that tract for 266.08 feet. This is the same line described in step 2 above.[6] The parties do not dispute that the iron rods are identical, but the Court wants to make this point perfectly clear because picturing a property boundary described merely in words can be difficult.

From that iron rod, the quitclaim deed continues:

> THENCE up the meanders of the centerline of York Creek with the meanders of said Creek for the following seven calls:

*Id.* Here, the quitclaim deed describes the directions of the creek's flow. It is unnecessary to include the exact calls. Suffice it to say that the border follows the meanders of the creek to the west until it reaches the western border of the Poole Tract:

---

[6] In surveying, a bearing of N 45°45'45" E 100 ft. and a bearing of S 45°45'45" W 100 ft. describe identical lines heading in opposite directions. In the first you start in the southwest and go northeast, while in the second you start in the northeast and go southwest. The quitclaim deed describes the border between the properties as extending from the iron rod N 51°45'20" E 266.08 ft. After following this line, to get back to the iron rod, you would retrace your steps and go S 51°45'20" W 266.08 ft. This fits almost perfectly the description of this line given by original deed: "S 51°50'10" W 266.15 ft. to an iron rod." Thus, we can be sure that the iron rods described in each deed are one and the same.

> THENCE with the west line of the said Poole Tract N 08°39'00" E,
> 6.76 feet to a ½ inch rod found for the northwest corner of the said
> Poole tract, said iron rod being also an angle point in the south line
> of the said 35.293 acre tract;

*Id.* This iron rod is the same iron rod described in step 4 above. We know this from the next two

calls in the quitclaim deed:

> THENCE with the south line of the said 35.293 acre tract, the north
> line of the Poole Tract and the north line of the herein described tract
> the following two calls:
>
> (1) S 81°46'18" E, 830.75 feet to a ½ inch iron rod found for an
>     angle point, and
> (2) N 75°54'28" E, 488.18 feet to a ½ inch iron rod found for the
>     POINT OF BEGINNING, containing 1.33 acres of land.

*Id.* These two calls form the same boundary lines described in steps 3 and 4 above. The only

difference is these two calls in the quitclaim deed describe the lines from west to east while the

deeds from Mrs. Orr's parents describe them from east to west. The calls are otherwise the same

length and have the same bearings, confirming that they describe the same boundary line on the

south side of Mrs. Orr's 35.293-acre tract. So the southern boundary of Mrs. Orr's 35.293-acre

tract is the northern boundary of the 1.33-acre tract described by the quitclaim deed.

What is clear from these deeds is that the 35.293 acres belonging to Mrs. Orr by virtue

of the deeds gifted to her by her parents do not overlap at all with the 1.33 acres conveyed to Mr.

and Mrs. Orr by the quitclaim deed from FSP. The northern boundary of the 1.33 acres is the

southern boundary of Mrs. Orr's tract of land. There is no overlap. Therefore, Mrs. Orr could not

have already owned the quitclaimed land in fee simple by virtue of the deeds given to her by her

parents. The question, then, is on what basis could Mrs. Orr claim fee simple title to land that is

clearly not described in the warranty deeds given to her by her parents?

The Orrs give two grounds, both of which fail. First, the Orrs assert that the quitclaim

deed "was the product of a boundary dispute between FSP and Mrs. Orr," a dispute in which Mrs.

Orr prevailed. ECF No. 61 at 1–2. They argue that the dispute arose from a surveyor error. *Id.* at 1. This argument is unpersuasive.

Even assuming there was a surveyor error at some point in history, that does not overcome the words of the deeds. Those deeds clearly indicate that the land conveyed to Mrs. Orr by her parents did not include the 1.33 acres in question and that the Poole tract to the south *did* contain the 1.33 acres.

Nor does the fact that there was a dispute establish that FSP did not own title to the 1.33 acres or that Mrs. Orr already did. Even if the parties agreed that Mrs. Orr probably should have owned the 1.33 acres from the start, that agreement does not grant retroactive title beyond the scope of the deeds. There was never an official determination that FSP owned no title to the 1.33 acres. Were there such a determination, the Court is confident the Orrs would have presented it to the Court. But the Orrs and FSP resolved their dispute not with a court or administrative judgment stating that Mrs. Orr always owned the 1.33 acres or that she owned it as her sole and separate property going forward. Instead, the Orrs and FSP resolved the dispute by executing a quitclaim deed conveying whatever title FSP had in the 1.33 acres (which, from the deeds, it appeared to have) to both Mr. and Mrs. Orr.[7] Nothing about this dispute proves that FSP never owned title or that Mrs. Orr always did.

Second, the Orrs cite a Texas doctrine under which "[a] call to the bank of a creek is a call to the middle of the creek and establishes the creek as the proper boundary." *Terrill v. Tuckness*, 985 S.W.2d 97, 105 (Tex. App.—San Antonio 1998). The Orrs then characterize the quitclaim deed as "run[ning] north along the west line of the Poole Tract for 6.76 feet, *and then back to the east along the bank of the creek to the dam.* . . . [T]he land that FSP quitclaimed was

---

[7] Why the quitclaim deed included Mr. Orr if Mrs. Orr alone was to have title is a question the Court need not answer. The quitclaim deed includes Mr. Orr. That is indisputable.

the northern shore of the bank." ECF No. 61 at 6 (emphases added). If that were true, then the land north of the creek would, under Texas law, have already belonged to Mrs. Orr, because if the border of her land already extended to the shores/bank, then she already owned to the middle of the stream as well.

But the Orrs' description of the land that FSP quitclaimed is extremely inaccurate. The northern boundary of the quitclaim—which is also the southern boundary of the 35.293 acres that surely belonged to Mrs. Orr, Exhibit G52 ("THENCE *with the south line of the said 35.293 acre tract*, the north line of the Poole Tract and the north line of the herein described tract the following two calls:") (emphasis added)—did not, contrary to the Orrs' claim, return "east along the bank of the creek." That is a gross mischaracterization.

The first piece of evidence that the north line of the quitclaimed deed does not run along the bank of the creek is the wording of the quitclaim deed itself. The quitclaim deed describes the meanders of the creek using seven calls. Exhibit G-52. In other words, it describes the course of the creek using seven steps, reflecting the winding of the creek. But the northern boundary of the quitclaimed deed is described using only two calls. *Id.* Nowhere does it describe the eastward return as following meanders or following the creek in any way. Rather, the northern border consists of two straight lines—hardly the description of a meandering creek.

The second piece of evidence is the dimensions of the quitclaimed property. The Court will not do the trigonometry to provide exact dimensions, but some rough calculations are enough to show that the northern boundary does not merely follow the bank of the creek. The quitclaimed property is 1.33 acres, or 57,934.8 square feet. And the northern border of the quitclaimed property is approximately 1,319 feet long (830.75 + 488.18 rounded to the nearest foot). That being so, a rough approximation of the average width of the quitclaimed property is 44 feet (57,934.8 / 1319).

And because we know that the ends of the property are narrower (6.76 feet on the west side and coming to a point on the east side), there must be even wider portions in between. That is too wide to be just the bank of a creek. A forty-four foot wide bank would be a very large bank indeed. The only logical conclusion, then, is that the northern border quitclaimed property does not merely describe the northern shores/bank of the creek, but includes actual, usable land as well.

Because of this, the doctrine on which the Orrs rely is inapplicable. A call to the bank of a creek may be a call to the middle of a creek. But the southern border of Mrs. Orr's 35.293-acre property (or the northern border of the quitclaimed property) is not the bank of the creek. Instead, that southern border is two straight lines cutting across dry land. The stated purpose of the Texas rule is to "allow owners of properties abutting on both sides of a stream to have access to the waters of that stream." *Terrill*, 985 S.W.2d at 105. This prevents a situation where a landowner clearly owns the bank on one side of the stream, but someone tries to prevent access to the stream itself. But Mrs. Orr did not own the bank on one side of the stream (at least for the segment in question—she undoubtedly owned one side of the stream farther west). The tract to the south, the Poole Tract, contained the whole stream, the banks on both sides, and some more land to the north. The Orrs essentially ask the Court to expand the Texas doctrine to say that a landowner owns all the land between the land defined in her deed and any reasonably close stream. But that is not the law. Thus, Mrs. Orr did not, by virtue of the deeds gifted to her by her parents, own the 1.33 acres of land located between the southern border of her property and the creek, which was located in the Poole tract owned by FSP.

### 3) Summary of the Court's Conclusions Concerning the Quitclaim Deed.

In this case, because it is the Orr's burden to show that the Cost Property is Mrs. Orr's separate property, they bear the burden of showing that the Hays Property, which was used to acquire the Cost Property, was also Mrs. Orr's separate property. The Hays Property consists of

two segments: (1) a 35.293-acre tract gifted to Mrs. Orr by her parents that is unquestionably her separate property, and (2) a 1.33-acre tract that was quitclaimed to both Mr. and Mrs. Orr.

A quitclaim deed, by itself, is sufficient to convey title to land if any is had in the grantor. But a quitclaim deed is not enough to prove that title is valid in the grantee. The title may be valid, or it may not be valid. In this case, because the Orrs bear the burden of showing that the Hays Property is Mrs. Orr's separate property, they also bear the burden of showing that the quitclaim deed made out to Mr. and Mrs. Orr did not actually convey any title to Mr. Orr. This they fail to do.

First, the 1.33 acres described in the quitclaim deed are demonstrably, completely separate from the 35.293 acres described in the deeds from Mrs. Orr's parents to Mrs. Orr. There is no overlap. Second, that the Orrs disputed ownership of the 1.33 acres with FSP does not prove that FSP did not own any interest to those acres or that Mrs. Orr already owned them. And third, the land described by the quitclaim deed is not merely the banks of the creek, but contains interior land as well. As such, the Court concludes that Mrs. Orr did not own the 1.33 described by the quitclaim deed prior to that deed's issuance.

Based on this, the Court concludes that the Orrs have not shown by clear and convincing evidence that the quitclaim deed did not pass any title in the Hays Property to Mr. Orr. To the contrary, the Court finds it more likely than not, based on the wording of the various deeds, that the quitclaim deed did give Mr. Orr a community interest in the second, 1.33-acre segment of the Hays Property. And because that segment of the Hays Property was used to acquire the Cost Property, the Cost Property is likewise community property.

### C. The Government May Reach Mr. Orr's Interest in the Cost Property to Satisfy His Tax Debts.

Because the Cost Property is community property, Mr. Orr owns a 50% interest in it. *Carnes*, 533 S.W.2d at 371. The question now is whether the Government may reach that 50% and force a sale of the Cost Property to satisfy Mr. Orr's tax liabilities. As the Court stated earlier, the Government may reach all of Mr. Orr's property interests, including community property interests. 26 U.S.C. §§ 6321, 6331, 6334, 7403. Therefore, the IRS may reach Mr. Orr's 50% interest in the Cost Property to satisfy his tax liabilities. The Court will order the Cost Property sold, the proceeds thereof to be used to satisfy Mr. Orr's tax liabilities and to compensate Mrs. Orr for her community interest in the property.

## VI.    Alternative Arguments

The Government's main argument over the course of this litigation has been that the Cost Property is community property. And the Court agrees. But the Government makes two alternative arguments as well to which the Court now turns. First, the Government argues that Mrs. Orr holds title to the Cost Property as Mr. Orr's nominee. Second, the Government argues that it may foreclose its tax liens against Mr. Orr's homestead interest in the Cost Property. The Court rejects the first argument and does not reach the second.

### A. Mrs. Orr Does Not Hold Title to the Cost Property as Mr. Orr's Nominee.

As an alternative argument, the Government asserts that Mrs. Orr is a nominee of Mr. Orr, and that Mrs. Orr holds title to Mr. Orr's interest in the Cost Property for Mr. Orr's benefit.

Property held by a taxpayer's nominee or alter ego may be subjected to a federal tax lien or levy. *Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977). The nominee theory focuses on the taxpayer's relationship to a piece of property. *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000). The ultimate inquiry is whether the taxpayer has

engaged in a legal fiction by placing legal title to property in the hands of a third party, while actually retaining some or all of the benefits of true ownership.

All parties agree that the Court should analyze this question using the six factors cited by the Fifth Circuit in *Oxford Capital*. These factors are: "'(a) No consideration or inadequate consideration paid by the nominee; (b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property; (c) Close relationship between the transferor and the nominee; (d) Failure to record conveyance; (e) Retention of possession by the transferor; and (f) Continued enjoyment by the transferor of benefits of the transferred property.'" *Id.* at 284, n.1 (quoting *Towe Antique Ford Foundation v. Internal Revenue Service*, 791 F. Supp. 1450, 1454 (D. Mont. 1992)). Applying these factors, the Court concludes that Mrs. Orr does not hold title to the Cost Property as a nominee of Mr. Orr.

(a) **No consideration or inadequate consideration paid by the nominee.**—Mrs. Orr paid a significant amount of consideration for the Cost Property, including the 35.293 acres of the Hays Property that was her sole and separate property. That was not all the consideration paid for the Cost Property, but the Court cannot conclude that it was *inadequate*. This factor weighs against nominee status

(b) **Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property.**—Mrs. Orr has held title to the Cost Property since the Orrs purchased it in 2006. At that time, Mr. Orr had already failed to pay his 2001 federal income taxes. But at that time, the IRS would not assess that tax against him for another two years or bring this suit for another 10. So while it is possible

that Mr. and Mrs. Orr always planned to keep Mrs. Orr's property separate so that they would both have somewhere to live while Mr. Orr failed to pay his income taxes, the Court cannot conclude that the Cost Property was placed in Mrs. Orr's name in anticipation of a suit that did not begin for another 10 years. This factor weighs against nominee status.

**(c) Close relationship between the transferor and nominee.**—Mr. and Mrs. Orr are married. That is as close a relationship as you can get. This factor weighs in favor of nominee status.

**(d) Failure to record conveyance.**—Every deed in this case has been properly recorded. There is no deed from Mr. Orr to Mrs. Orr, but that is to be expected because Mr. Orr never held title to the Cost Property in the first place. This factor weighs against nominee status.

**(e) Retention of possession by the transferor.**—Mr. Orr continues to live on the Cost Property to this day. But this is to be expected because he is married to Mrs. Orr and married couples tend to live together. This factor weighs neither for nor against nominee status; the Court will not hold it against a married couple to live together.

**(f) Continued enjoyment by the transferor of benefits of the transferred property.**—Mr. Orr continues to live on, to enjoy, and to use the Cost property and all of the benefits it provides. But again, this is to be expected from a married couple, and the Court will not hold it against a married couple to live together.

Considering all these factors together, the Court concludes that Mrs. Orr does not hold title to the Cost Property as a nominee.

### B. The Court Does Not Reach the Question of Whether the IRS May Foreclose Its Tax Liens Against Mr. Orr's Homestead Interest.

As its second alternative argument, the Government argues that it may foreclose its tax liens against the Cost Property because even if Mr. Orr has no ownership stake or title to that property, he undeniably has a homestead interest. The question presented—whether a homestead interest is an independently sufficient interest on which the IRS may foreclose to recover tax liabilities—is one of first impression. The consequences of answering this question in the affirmative would be serious. It could result, as the Orrs' counsel argues, in Mrs. Orr's inability ever to own a home again, because with each home she buys Mr. Orr would immediately acquire a homestead interest on which the IRS could foreclose.

The Court need not answer this question. Because the Cost Property is community property, the IRS need not resort to foreclosing on a mere homestead interest. Therefore, the Court leaves this question to another day and another case.

### Conclusion

The foregoing shall constitute the Court's findings of fact and conclusions of law. To conclude, the Court will summarize the key findings and conclusions behind the Court's decision to permit the IRS to foreclose on the Cost Property and sell it to satisfy Mr. Orr's tax debts:

(1) Part of the consideration paid for the Cost Property was the earnest money deposits paid by Mr. Orr with his own separate funds. These deposits were neither gifts nor repaid.

(2) Part of the consideration given for the Cost Property was a 1.33-acre segment of land quitclaimed to both Mr. and Mrs. Orr. The Orrs have failed to show by clear and convincing evidence (or at all) that Mr. Orr did not own any valid title to this land. They also failed to show by clear and convincing evidence (or at all) that Mrs. Orr owned any title to that segment of land before the quitclaim deed was issued. In fact, the Court finds it more likely than not, based on the wording of the deeds involved, that Mr. Orr did own valid title to the land.

Based on these conclusions, the Court finds that the Orrs have failed to trace the origin of the Cost Property solely to Mrs. Orr's separate property. Therefore, the Orrs have failed to meet their

burden of showing by clear and convincing evidence that the Cost Property, which was acquired by the Orrs during their marriage, is separate property. Instead, the presumption of community property prevails. TEX. FAM. CODE § 3.003(a).

Further, the Court concludes that it is more likely than not that the Orrs used a mix of Mrs. Orr's separate property (the 35.293-acre portion of the Hays Property), Mr. Orr's separate property (the earnest money deposits), and community property (the 1.33-acre portion of the Hays Property that was quitclaimed to both Mr. and Mrs. Orr) to acquire the Cost Property. Having been purchased with commingled funds, the Cost Property is community property. Because the Cost Property is the Orr's community property, Mr. Orr has a 50% interest in that property and the Government may foreclose its lien upon the property, sell it, and use the proceeds thereof to satisfy Mr. Orr's tax liabilities and to compensate Mrs. Orr for her interest in the property.

The Court will order that the IRS foreclose the federal tax liens against Ton and Carolyn Orr and the Cost Property. The Cost Property will be sold to pay Mr. Orr's 2001 federal income tax debt and all interest and penalties that have accrued or will accrue on that debt, after payment of reasonable expenses of sale and any unpaid ad valorem taxes owed to the County of Gonzalez pertaining to the Cost Property. The United States shall also recover its costs from Mr. Orr, out of the proceeds of the sale of the Cost Property. Any excess sales proceeds shall be used to compensate Mrs. Orr for her interest in the Cost Property.

**It is so ordered.**

Signed: August ____ 2̲8̲ ____, 2018.

HONORABLE ROYCE LAMBERTH
UNITED STATES DISTRICT JUDGE